**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 23-cr-241 (GMH)** |
| v. | : | |
| | : | |
| CINDY YOUNG, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. On August 9, 2024, Defendant Cindy Young was convicted of four misdemeanors: 18 U.S.C. §1752(a)(1) (entering and remaining in a restricted building or grounds) (Count 1); 18 U.S.C. §1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds (Count 2); 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three); and a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government respectfully requests that this Court sentence Defendant Cindy Young to 10 months' incarceration, followed by one year of supervised release, a fine (to be determined after an accounting of crowd-sourced legal defense fund through the website Give Send Go), $500 in restitution, and a mandatory assessment of $220.

## I.    Introduction

Defendant Cindy Young, a 67-year-old from New Hampshire, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress' certification of the 2020 Electoral College vote count, threatened the peaceful transfer

of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Young was convicted, by a jury of her peers, for her actions on January 6. The government's recommendation is supported by the defendant's: 1) breach of Capitol grounds, including her actions in scaling the Northwest steps' ledge; 2) 26-minute breach of the Capitol, during which she accessed highly sensitive areas of the Capitol, directly putting officers, House members, and staff at risk; 3) continued espousal of false information about January 6 in public forums; and 4) complete lack of remorse for her actions.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Young's crimes support a sentence of 10 months' incarceration.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1-1, Government Exhibits (GEX) 101 and 114, and the trial transcripts.

*Defendant Young's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Young traveled from New Hampshire to Washington, D.C. on a bus that was specifically organized to transport people to the former president's "Stop the Steal" rally. Prior to boarding the bus, Young posed for pictures, (GEX 401) and gave an interview stating her reason for attending the rally, stating "I think our country is at a crossroad," GEX 403.



*GEX 401 is a photo of Young holding a flag that reads "TRUMP 2020-NO MORE BULLSHIT."*

On January 6, Young attended the rally before joining a large group walking to the Capitol. Once on Capitol grounds, Young entered the restricted perimeter on the West side of the grounds

and joined the growing riot that had pushed officers back to the base of the Inaugural Stage. Young made her way up to the north side of the West Plaza where she scaled the Northwest Steps' banister ledge. *See* GEX 406 (still below).



*GEX 406 (at :12) showing Young scaling the Northwest Steps with the assistance of rioters*



*Image 1 showing Young atop the Northwest steps as the riot stretched out below her*

On top of the landing, Young chanted with fellow rioters. Young remained on top of the steps for some time, ignoring commands to leave and threats of less-lethal force, including gas and

pepper ball guns. GEX 407. Young eventually climbed back down into the crowd but did not leave. GEX 406.



*GEX 407 (at :37) showing an U.S. Capitol Police officer (blue) pointing a pepper ball gun at the crowd, including Young (yellow), on the steps.*

Instead, she remained an integral part of the riot, as USCP tried to hold off the advancing mob on the West Plaza and Northwest steps. At approximately 1:55 p.m., an MPD Civil Disturbance Unit, dressed in full riot gear, arrived to assist USCP officers holding the line on the West Plaza. As they marched through the Northwest portion of the riot, several officers were attacked by rioters. As the officers were assaulted just feet from her, Young turned her back on them and moved deeper into the mob. *See* GEX 601 and 605A. As the officers continued to struggle with their assailants in the foreground, Young yelled "Tell the truth!" and chanted "Our house!" GEX 405 at 2:01. Off to her left, discarded perimeter barriers were positioned on the Northwest Steps' wall, serving as ladders for rioters to scale the banister. *Id*. at 1:41.

At approximately 2:09 p.m., rioters overran the Northwest Steps, giving them access to the exterior of the Capitol, and at 2:12 p.m., rioters breached the Building. Young followed, marching through the scaffolding, up the Northwest stairs, and past strewn barriers to the Upper West

Terrace. GEX 418. There, USCP riot officers stood guarding the Parliamentary Doors as the former vice president was prepped for evacuation inside. *See* GEX 418 and 419.



*Still from GEX 418 (at :06) showing Young starting her ascent of the Northwest Steps*

At approximately 2:22 p.m., Young entered the Capitol Building through the Senate Wing emergency exit doors. GEX 301. As she entered, former Vice President Mike Pence and his family were still inside the Building, awaiting the "okay" to evacuate, which occurred at approximately 2:25 p.m. GEX 201.



*Still from GEX 301 which is CCTV that captures Young chanting "USA!" as she breached*

After entering, Young moved towards the Crypt, quickly proceeded upstairs, and entered the Rotunda at approximately 2:26 p.m. *See* GEX 304 and 305. Young appeared to be filming the Rotunda as she crossed from north to south. *Id*. Young exited from the Rotunda at about 2:27 p.m. and moved into Statuary Hall as she again chanted "USA!" *Id*.

As Young walked through Statuary Hall, moving closer to the House of Representatives, she yelled, "We own it; we own you!" GEX 420 at 2:30 and GEX 421A at 2:03. Young then marched towards the House Chamber doors at approximately 2:28 p.m., becoming one of the first rioters to face off with the last line of officers protecting the House at this location. *See* GEX 308. At the time of her arrival, the House of Representatives was still in session. The threat of the ever-growing mob forced the House to recess and evacuate. After an eight-minute standoff with officers, during which Young chanted "USA!," (GEX 420), rioters broke past a police line with Young still at the front of the mob. GEX 308 at 9:00. Capitol Police Deputy Chief Thomas Loyd, who had left the police line to begin prepping the evacuation of the House, witnessed the aftermath of the fall,

recalling: "I looked down [the hallway], and by the time I had returned, they had breached the line, and they were going—attempting to break into the House [M]ain [D]oor." Tr. Tran. 8/7/24 at 64–65. The mob breached two sets of the House Main Doors before being stopped by the final door, barricaded from within the Chamber, and officers with drawn weapons.

Despite ingesting pepper spray and witnessing a USCP officer fighting his way out from the surge that had pinned him in the vestibule, Young stood outside the Chamber doors for approximately five minutes. During this time, Young loudly chanted "Stop the Steal!" GEX 425B at :27 (still below). On numerous occasions, the crowd also chanted "Break it down!" as Young maintained her position in the thick of the mob.



*Still from 425B (at :27) showing Young facing the outer House Main Doors as she chants "Stop the Steal!"*

After overhearing a fellow rioter call out that members of Congress were evacuating down the hall, Young eagerly left her position and ran in the indicated direction, turned right and down a hallway leading to the Speaker's Lobby, where, in fact, the members were mid-evacuation. GEX

424A at 2:35-4:00. Young reached the Speaker's Lobby at approximately 2:42 p.m. GEX 311. Deputy Chief Loyd testified that "[t]he Speaker's lobby [was] very vulnerable at that particular time because the doors [were] made mostly of glass." Tr. Tran 8/7/24 at 64. Deputy Chief Loyd, himself, was down the opposite end of the Lobby hallway "in the process of evacuating members of Congress out of those doors." *See id.* at 93.



*Still from GEX 424A at 3:54 capturing Young turning down the Speaker's Lobby*

The evacuating members and staff were visible to rioters who cried out "They're leaving! They're leaving!" as the mob's numbers grew GEX 422B and 427. The mob continued to scream at officers guarding the Speaker's Lobby Door. Several members of the crowd began to pass up a chair and wooden sign to the front of the mob while a rioter smashed out all the windowpanes to the Speaker's Lobby Doors with a helmet. GEX 424B at 1:14. Though, at this time, the members and staff from the floor were cleared, members, staff, and press still remained in the gallery. GEX 428. This gave way for another rioter to climb up and through the missing windowpane, causing

the rioter to be shot by police, at approximately 2:44:42 p.m., ensuring the safety of those evacuating and those still inside the House. *See* GEX 421A, 422B, 424B, and 318.

Approximately one minute later, at 2:45:33p.m., Young, abandoned her flags, left the Speaker Lobby area, and walked back towards the House Chamber doors before rerouting her exit due to chemical dispersant in the air. GEX 309. Young finally exited the Capitol Building at approximately 2:48 PM, having spent approximately twenty-six minutes in the building. GEX 315.

The evening of January 6, 2021, Young made a Facebook post (the media contents of which had been deleted by the time the FBI reviewed the comment section) that initiated lengthy discourse between Young and several Facebook 'friends' in the comment section. GEX 504A. Young agreed that January 6 signaled the "end of times" and stated she "knew" Pence would "go this way," referencing the former Vice President's refusal to interfere with the certification. *Id*. Young also called former Vice President a "pedo" and told a friend she was "sorry to hear that" after the friend pointed out the absurdity of her claims and behavior. *Id.*

*Defendant's Interviews*
*Young's January 2021 Interview*

On January 13, 2021, Young gave a voluntary telephonic interview to the FBI. During the interview, she admitted traveling to Washington by bus in order to attend the Stop the Steal rally. Young believed she had learned about the buses through "The Concord Conservative Group." Young told agents what she wore and admitted to going inside the Capitol Building. Young described the Capitol grounds as a "war zone" because of the deployment of "flash bombs." Young falsely told the FBI that she went inside the Capitol because "security personnel" had opened the doors for protesters and, once she entered, she could not turn around or she would have been trampled. This is contradicted by both open-source and CCTV, which captured the violent breach of the Senate Wing door and adjacent windows by rioters. Young, not in any danger of being

stampeded, walked past these smashed windows, past the damaged door and blaring door alarm, and into the building all while chanting "USA!" Young told agents she did not go further than "a hallway off the Rotunda" but that her goal in entering the Capitol was to "get to the hearing room to have her voice heard." This claim was contradicted by CCTV and open-source video which captured Young outside the House of Representatives and the Speaker's Lobby. Young stated a "security/police officer" used a bullhorn to tell people if they were quiet, they could be "'let in near the hearing room,'" which is contradicted by video which shows a fellow rioter attempting to unite the mob against police as Young echoed his messaging. GEX 421A at 6:55-7:00.

Young stated she left the Capitol specifically after seeing people breaking windows and passing a chair to be used to break windows. Young did not mention witnessing a shooting at all. Young left the Speaker's Lobby area at approximately 2:45:33 p.m. because of the shooting. Young also told the FBI she was concerned she would be shot, as she attempted to leave, because she saw officers dressed in military gear entering the building after the shooting.

Young also told FBI agents that she took a few photos outside the Capitol but that she was unable to take photos inside. Both open-source and CCTV captures Young continuously filming as she traversed the Capitol building. Young also told agents she had recently deleted her Facebook account.

*Young's February 2022 Interview*

On February 11, 2022, Young was again interviewed by the FBI. Young reiterated that she traveled to Washington, D.C. by bus on the evening of January 5, 2021. Young admitted to hearing flash bangs and "lots of noise", saying "things got crazy." During this interview, Young admitted to making it further into the Capitol. Young once again falsely claimed an officer told the crowd "'If you quiet down, we will let you in" while outside the hearing room. Young again distanced

herself from the shooting, restating she left after the chairs were passed up to break windows, which is refuted by CCTV and open source.

Young admitted it was wrong to go inside the Capitol and that she regretted her actions. Young stated she had recently been banned from Facebook for posting a video which she did not further describe to agents. Young reiterated that she only had photographs from outside the Capitol and none from within the building. Young showed her phone to agents who observed only photos from the rally. However, CCTV shows Young appearing to film on both the first and second floors of the Capitol, which suggests Young deleted the video or photographs she took inside the Capitol. Young did allow agents to photograph the clothing she wore on January 6, 2021 and signed three photographs of herself including a still of her outside the House of Representatives which she captioned "THAT IS ME STANDNG NEAR THE HEARING DOORS!" *GEX 501*. At the end of the interview, Young once again stated she should not have been inside the building. Young has since retracted this regret, continually using social media to advance false information about January 6, 2021, in an attempt to downplay and justify her actions.

*Social Media Posts*

*Post Arrest, Pre-Trial Social Media*

Between her arrest and trial, Young has made her disdain for the prosecution of January 6 defendants well known on social media. Young operates an X account (formerly known as Twitter) with the handle is "@j6cindylouwho," a braggadocios reference to her criminal activity on January 6, 2021. On April 5, 2024, Young posted a still image recounting a civil suit served on USCP officers by January 6 defendants next to a video of her singing "We're not going to take it!." In the video, Young is wearing a sweatshirt reading "Indicted We Stand" with a photo of herself in an apparent celebration of her own crimes and the civil suit. Sent. Ex. 1.




**Cindy Young** ✔ **@j6cindylouwho · 4/5/24**    ···

**JAN 6ERS STRIKE BACK WITH MASSIVE LAWSUIT!!**

**LAST NIGHT THE HIGHEST RANKING OFFICER ON J6, ERIC WALDO – WAS SERVED WITH THE J6 CLASS ACTION LAWSUIT SUMMONS**

3:22

*Sent. Exhibit 1*

On May 18, 2024, Young was a guest on a radio show called Cowboy Logic.[2] During the interview, Young lied to the hosts, saying she never saw any barriers on Capitol grounds (3:20), despite video showing barriers strewn all over the property and in close proximity to Young. Young echoed falsities from her FBI interviews like: officers inviting the crowd inside the hearing room (5:50) and that she left well before the shooting (7:05)—all contradicted by CCTV and open-source video. At the conclusion of her interview, Young stood at attention as the hosts played a rendition of the National Anthem sung by detained January 6 defendants who claim to be political prisoners (22:20).

On April 22, 2024, Young was also a guest on David Sumrall's 'Discussion Island' podcast.[3] As discussed further below, Mr. Sumrall actually testified in this case as a "fact" witness. During the podcast, Young likened reviewing her discovery with prior counsel to being sent a "re-

---

[2] The interview is available at https://rumble.com/v4uri7c-cowboy-logic-051824-cindy-young-j6er-grandmother.html and information on Cowboy Logic available at https://cowboylogic.us/.

[3] The interview is available at https://rumble.com/v4r6a9i-discussion-island-episode-100-cindy-young-04222024.html.

education camp" (11:50-12:15). Young appeared to agree with some of Sumrall's more outrageous statements, including his call for the jailing of judges and jurors who participated in Jan. 6 cases (19:15-20:00). Sumrall also stated he hopes his viewers, in the future, will write the "hopefully" jailed judges and jurors to let them know "how bad they did" when it comes to convicting and sentencing the "hostages" (19:40).[4] Young also bragged about joining "the first" civil lawsuit against USCP officers (25:20).



*GEX 510A at 2 showing Young with Proud Boys while wearing a "January 6 WAS A SET UP" shirt*

---

[4] Of the thirty-six letters of support sent to this Court, on behalf of Young, in advance of sentencing, fourteen appeared to take Sumrall's advice by regurgitating false information related to January 6 generally and Young's specific facts. One specific letter, alarmingly warned this Court to "quickly" familiarize itself with military tribunals and to "think deeply about [this Court's] actions and the consequences that might be headed [this Court's] way."

On July 6, 2024, Young posted a seven minute and twenty-seven second YouTube video titled "What an adventure" along with the caption "People (In Washington, DC) get ready! There's a train a coming!"[5] The video is a photographic montage capturing Young, among other things: 1) wearing the custom "Indicted We Stand" sweatshirts with her photo on it (7:07); 2) mocking the FBI and DOJ (1:05 and 3:22); 3) referring to the January 6, 2021 prosecutions as political persecution; and 4) standing with members of the Proud Boys, while wearing a shirt that reads "January 6 was a set up" (:40). *See also* GEX 510A.

At trial, Young called Sumrall as a witness in her defense. During his trial testimony, Sumrall doubled down on his bias against those involved with January 6, 2021 prosecutions. On cross-examination, Sumrall called for "divine justice" against those involved in prosecuting January 6 defendants. Tr. 8/8/24 at 98. Specifically, he called for those involved in the January 6th investigation to be jailed, *id.* at 99 ("Yes."), for the prosecutors to be jailed, *see id.* ("Absolutely."), and even the judges, *id.* ("Yes. If they did wrong, yes."). Additionally, Sumrall made open threats during his testimony:

> Q: You've also said that we should all consider January 6th a warning sign?
> A: Yes.
> Q: You said that if courts don't do it and the system doesn't do it, the protesters might not remain peaceful next time?
> A: That's right. That would be terrible.
> Q: And you said, "If the protesters can do that in two hours with no weapons, they really don't want to piss us off," correct?
> A: Exactly.

*Id.* While Sumrall's words are not those of the defendant, in light of her overall conduct, statements, and behavior, it is difficult to discern daylight between the two. In particular, Young continues to endorse many of the things that led to her involvement in the riot in the first place. As

---

[5] The video is available at https://www.youtube.com/watch?v=dCF-V3-67Ns and information related to Sumrall and his "cause" is available at https://stophate.com/.

discussed below, this behavior warrants not only punishment, but serious rehabilitation and deterrence.

*Post-Trial Social Media*

On August 11, 2024, Young took to her X account, posting a video of herself riding a horse to the U.S. District Court for the District of Columbia (this video appears to have been recorded while Young was awaiting her trial verdict in Washington, D.C., based on statements made and the presence of her trial attorney in the video). Young captioned the video "riding in style to offer up my pound of flesh to the Biden Regime."[6] Sent. Ex. 2 (shown below). Additionally, her current X profile picture is a photograph of her riding a horse with the United States Capitol Building in the foreground. Sent. Ex 3.



*Sent. Ex. 2*

In other words, Young appeared to view her criminal trial – a serious endeavor presided over by a federal judge and assessed by citizens of this country – as a political statement or a joke.

---

[6] Tweet available at https://x.com/j6cindylouwho/status/1822611159620440441.

On August 29, 2024, in response to a video depicting then-Speaker Nancy Pelosi, Young posted that it is "[t]ime for the real insurrectionists to feel the pain."[7] Sent. Ex. 4. Even after having had been convicted by a jury, Young – on September 5, 2024 – continued to endorse Sumrall's false claims that the crowd had not overrun police on the West Plaza.[8] Sent. Ex. 5. Of course, evidence at trial that proved that it was the riot that pushed back the police line on the west front of the U.S. Capitol Building on January 6, 2021. *See* GEX 114 (CCTV footage); GEX 602 at 34:35–44:30; Tr. 8/8/24 at 93–94.

That same day – September 5, 2024 – Young reposted a movie trailer by the satire website Babylon Bee, severely minimizing the significance of the January 6th attack and mocking attempts to seek justice for the victims of the attack.[9] Sent. Ex. 6. On September 8, 2024: Young posted "Oh YA [thumbs up emoji]" in response to the question, "Do you think Nancy Pelosi should go to PRISON for orchestrating J6?"[10] Sent. Ex. 7. On September 17, 2024, Young responded, in support, to a tweet advocating for the jailing of the current U.S. Attorney for the District of Columbia, the Attorney General, and the former Vice President Mike Pence, presumably for their attempts to sustain the peaceful transition of power in the United States. Sent. Ex. 8. On October 2, 2024, Young retweeted a meme mocking USCP officers' emotional recounting of the horrors they encountered on January 6. Sent. Ex. 9. This despite the fact that many officers sustained life-threatening injuries on January 6, 2021.[11] Ultimately, such conduct underscores her utter lack of remorse or acceptance of responsibility.

---

[7] Tweet available at https://x.com/j6cindylouwho/status/1829103280930107903.

[8] Tweet available at https://x.com/j6cindylouwho/status/1831794363967664462.

[9] Tweet available at https://x.com/DC_Draino/status/1831787468594803132.

[10] Tweet available at https://x.com/j6cindylouwho/status/1832928913544134850.

[11] In the days and weeks after the riot, five police officers who served at the U.S. Capitol Building on January 6, 2021 died. *See* New York Times, *These Are the People Who Died in Connection*



*Sent. Ex. 9*

*The Charges*

On June 21, 2023, the United States charged Young with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 9, 2024, Young was convicted on all four counts following a four-day jury trial.

**III.    Statutory Penalties**

As noted by the draft Presenting Report (PSR), Young faces up one year of imprisonment for her violations of 18 U.S.C. §§ 1752(a)(1) and (2) and six months imprisonment for her violations of 40 U.S.C. §§ 5104(e)(2)(D) and (G). She also faces a fine of up to $100,000 for each Class A misdemeanor and $5,000 for each Class B misdemeanor.

---

*With the Capitol Riot* (January 5, 2022), https://www.nytimes.com/2022/01/05/us/politics/jan-6-capitol-deaths.html.

**IV.    The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government generally agrees with the Sentencing Guidelines calculation initially set forth in the PSR.

| | |
|---|---|
| Count One (1752(a)(1)): | |
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| | |
| Total | 6 |
| | |
| Count Two (1752(a)(2): | |
| Base Offense Level (U.S.S.G. 2A2.4(a)) | +10 |
| | |
| Total | 10 |

*See* PSR at ¶¶ 36-41.[12]

Under U.S.S.G. § 3D1.2(a)-(c), "closely related counts" group. Here, the violations of 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § 1752(a)(2) group because they have the same victim –

---

[12] Probation applied a two-level reduction, under Section 4C1.1, bringing the total offense level, as calculated by probation, to 8. The government objects to this application for the reasons discussed below.

Congress. *See* U.S.S.G. § 3D1.2(a) and (b). The offense level for that Group is "the highest offense level of the counts in the Group," pursuant to U.S.S.G. § 3D1.3(a). Here, the highest offense level is 10, so the offense level for the Group is 10. PSR at ¶¶ 34-35.

However, Section 4C1.1 should not apply because Young's presence created a credible threat of violence when she joined a mob outside the House of Representatives at two different locations. The credible threat of force was defined by Judge McFadden as "a believable expression of an intention to use physical force to inflict harm." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 6. And, when examining whether the defendant's conduct posed a credible threat of violence, the Court must consider the totality of the circumstances surrounding Young's conduct. *See e.g., United States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12. ("In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.").

Here, the totality of the circumstances surrounding Young's conduct shows a credible threat. Specifically, Young and the mob's presence at both the House Main Doors and Speaker's Lobby did in fact prove to be a credible threat of violence as guns were drawn and an advancing rioter was shot. Young stood outside the House Chamber doors as the crowd chanted "Break it

down!" – a clear reference to the doors behind which lawmakers had sheltered in place. After overrunning officers at the House Main Doors, Young positioned herself in the crowd as the mob attempted to get through the final door. When it was made known there was another way to the House of Representatives, Young eagerly ran down a hallway leading to the Speaker's Lobby, where she believed she could confront House members who were in the process of evacuating. Many in the mob had the chance to confront fleeing members and staff at this location. Once again, Young positioned herself in the mob as others passed forward chairs and signs to be used against the final police line.

The Court should also not apply § 4C1.1 here for the reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). For the reasons described above, the defendant's conduct caused a significant disruption to a vital governmental function, warranting

an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Moreover, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

Consequently, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same

sentence regardless of whether § 4C1.1 applies.[13]

The U.S. Probation Office calculated Young's criminal history as a category I. PSR at ¶ 47. Accordingly, the U.S. Probation Office Young's total adjusted offense level, after applying § 4C1.1, is calculated at 8, and her corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 43 and 94. The government disputes the application of § 4C1.1, and calculates Young's total adjusted offense level at 8, with a Guidelines range of 6-12 months.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 10 months' incarceration, one year of supervised release, a fine, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Young's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Young, the absence

---

[13] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

of violent or destructive acts is not a mitigating factor. Had Young engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Young's case is her proximity to the House of Representatives while members, staff, and press were still present and her role in intentionally joining the mob there. Her presence not only directly delayed the Certification but presented a threat to security and safety. Before Young came within feet of the House, Young stood above the violent mob that infiltrated the West lawn of the Capitol, pushing officers back, through and over the Inaugural stage. She ignored the littered barricades and assaults on officers, chanting "OUR HOUSE!" with the crowd. She continued to chant "OUR HOUSE" and "USA" through two floors of the Capitol, delaying the peaceful transfer of power for the first time in American history.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 10 months' incarceration in this matter.

### B. Young's History and Characteristics

As set forth in the PSR, Young is quite guarded about her current life. ECF 22 ¶¶ 25-29. Young was open about her past, recounting the loss of her mother at a young age and her struggles with both drugs and alcohol due to her mother's death and father's absence from her life. After drug and alcohol use in her youth, Young has been sober for forty-years, not only participating in AA but also serving as a mentor within the programs. Young also served as a court guardian for many years in New Hampshire. This is Young's first arrest, and she has been compliant with his conditions of pre-trial release. We commend her sobriety and mentorship.

Nonetheless, Young's refusal to recognize the severity of her actions and to denounce the violence she saw with her very own eyes must be weighed (and indeed, outweigh) against her mitigation. Young unapologetically overran police at both the House Main Doors and Speaker's

Lobby. She joined a mob, whose concerted actions created a risk for the safety of those in the House, causing officers to draw their guns at both locations. The mob was not deterred by the officers' warnings and their repeated violent advances culminated in the shooting of a rioter who jumped through a smashed-out window. Only then did Young begin her exit from the building and, although she has distanced herself from her presence at the front of lines, assaults, and the shooting, she continues to proudly trumpet her participation on January 6 as a badge of honor. It is not.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).[14]

General deterrence is also an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. As Young continues to push a false narrative around January 6, those who subscribe to similar falsities will be watching. In fact, as stated above, fourteen of the letters written on behalf of Young deny the truth or gravity of the January 6 riot and Young's participation. The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Young initially appeared to accept responsibility during her interviews with the FBI—which were peppered with self-serving statements designed to distance herself from the worst aspects of January 6—she quickly abandoned any pretense of accountability. Despite all the

---

[14] Young traveled to Washington, D.C. with Defendant Thomas Gallagher and wrote a letter on his behalf to the Court prior to his sentencing.

evidence produced in discovery and introduced at trial, Young relies upon, endorses, and continue to profess a narrative that does not exist in reality. Second, her pre- and post-trial conduct and statements are incredibly troubling. Whether Young is intentionally sowing discontent or recklessly embracing others, her conduct on January 6, coupled with her continued lack of remorse, demonstrate a meaningful need to specifically deter her from further crime.

As described above, pre-trial, Young went on podcasts, severely downplaying her and other rioters' actions on January 6, instead spreading false information about police and mocking the dangers she and other rioters placed them in on January 6. She proudly calls the events of January 6, 2021 an 'inside job' and continues to use rhetoric that has meaningful downstream effects. She endorses punishment for those she disagrees with (the former Vice President) and continues to blame everyone else for what she did that day. Nothing about her past or current behavior suggests that she is currently capable of meaningful reform, regret, or reflection. Thus, a serious sentence is warranted.

With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Young in a manner sufficient to deter her specifically, and others generally, from resorting to violence instead of civility in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[15] This Court must sentence Young based on her own

---

[15] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

Young has been found guilty of Counts One through Four. Counts One and Two are Class A misdemeanors while Counts Three and Four are Class B misdemeanors. 18 U.S.C. § 3559.[16] The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however to Class B misdemeanors.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[16] As indicated in the above section, Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.

And, while no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor, Speaker's Lobby, or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual within feet of the House poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. Kirstyn Niemela*, 21-cr-623-CRC, the defendant was convicted of the same four misdemeanors as Young in connection with her breach of the Capitol Building all the way to the House Main Doors. However, instead of carrying on, as Young did, to the Speaker's Lobby, Niemela entered the Rayburn Conference Room where she posed for pictures. Prior to breaching the Building, Niemela climbed a tree within the restricted grounds and observed gas and violence on the West Plaza. Judge Cooper sentenced the defendant 11 months of incarceration. At the very least, a similar sentence is warranted for Young because, unlike Niemela, Young was at the front of the mob that forced their way past the line of officers guarding the House Main Doors. Young ran to the Speaker's Lobby when she heard members were evacuating. There the mob's presence and actions caused a shooting. Instead of a tree, Young scaled the Northwest steps ledge, a location which eventually served as the vital breaking point.

In *United States v. Anthony Vo*, 21-cr-509-TSC, the defendant was convicted of the same charges as Young following a jury trial. Like Young, Vo entered the U.S. Capitol after watching

a mob of rioters overrun the outnumbered police on the west side. And like Young, after Vo was convicted at trial, he made several statements on social media and in interviews that misrepresented his conduct and attacked the integrity of his jury and the Court. Vo was inside the Capitol for approximately twenty-seven minutes, which is slightly longer than Young's approximately twenty-six minutes, but Vo only made it as deep as Statuary Hall. Judge Chutkan sentenced Vo to 9 months of incarceration followed by 12 months of supervised release. The amount of time in highly sensitive areas sets Young apart from Vo and warrants a higher sentence.

In *United States v. Rivera*, No. 1:21-cr-0060-CKK, the defendant was convicted of four misdemeanor offenses after a bench trial. *See* Findings of Fact and Conclusions of Law, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 62. The evidence showed that Rivera livestreamed his presence in the Capitol and "He urged his followers watching his Facebook livestream to share his livestream with their friends and followers" and proclaimed he was "about to take [his] ass to the middle of the [United] State[s] Capitol." *See* Sentencing Memorandum, *Rivera*, No. 1:21-cr-0060-CKK, ECF No. 69, pg. 5. Rivera announced to his followers that MPD officers were firing pepper spray at the rioters. *Id.*, at 7. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way up!" *Id.* Like Young, Rivera engaged in no violence in the Capitol, and left after approximately 20 minutes. Rivera was convicted of the same four charges of which the defendant stands convicted. The Court sentenced Rivera to eight months in prison. *Rivera*, No. 1:21-cr-0060-CKK, ECF. 82. A higher sentence is warranted for Young because she nearly breached the House of Representatives twice.

In *United States v. Russel Alford,* 21-cr-893-TJC, Alford entered the Capitol through the Upper House Door on the east side of the building. The door had been broken open about a minute before he entered, and at the time of his entry, a windowpane had been smashed and an alarm was

sounding continuously. Alford remained in the building for about 15 minutes. After the police began clearing people from his area, Alford initially disobeyed police commands to leave, then eventually left with the crowd. Alford took the stand at trial and provided false testimony as to his actions and observations on January 6, 2021. Convicted of the same misdemeanors as Young, Alford was sentenced to twelve months incarceration. Young deserves a similar sentence because, although she did not take the stand and lie, she has continued to downplay her role and the significance of her actions, as well as the riots' actions, on January 6, 2021.

The government does acknowledge that Judge Faruqui sentenced Rebecca Lavrenz to 6 months' home detention followed by 6 months' probation. *United States v. Rebecca Lavrenz*, 23-cr-66-ZMF. Similar to Young, Lavrenz has promoted herself as the "J6 praying grandma," has been called the prosecution of January 6 rioters a corrupt exercise. Lavrenz watched the breach of the East front police line and witnessed assaults of officers outside the Columbus doors before entering the Building. Inside, Lavrenz spent a total of 10 minutes only making it as far as the Small Senate Rotunda long after the Senate (and the House) had been evacuated. Despite her false testimony at trial and continued revisionist history of January 6, the court departed reasoning that prison would not be a deterrent for Lavrenz. Judge Faruqui did, however, order Lavrenz pay a $103,000 fine due to fundraising that exceeded legal costs. Young's actions are distinguishable from Lavrenz because Young perched on the northwest steps, breached the building for twice as long, and attempted to access the House from two separate and sensitive areas while members, staff, and press were still present.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or

deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Young was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[17]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion

---

[17] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

restitution and hold the defendant responsible for or her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf*. 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Young to pay $500 in restitution for her convictions on Counts One and Two. This amount fairly reflects Young's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $500 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

The defendant's two Class A misdemeanors convictions subject her to a total statutory maximum fine of $200,000 and a maximum fine of $10,000 for her two Class B misdemeanors convictions. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, the defendant has not shown, in part due to her refusal to show her federal tax returns, an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000-$40,000 or $2,000-$20,000 if the Court applies §4C1.1. U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. As the PSR notes and, looking most recently at her Give Send Go page[18], the defendant has raised over $14,000 in an online campaign Young created herself. PSR ¶ 91. The request for donations, purportedly written by the defendant, appears to have

---

[18] Young's Give Send Go is available at https://www.givesendgo.com/ProtectingFreedom.

been made while she was represented by the Federal Public Defenders; therefore, any money raised during that time would have not gone to legal fees. As hinted on her page, Young did eventually retain counsel which could account for part or all of the funds raised. However, Young did continue to advertise the Give Send Go Page on Sumrall's podcast, indicating it was for more than just legal fees. If any of the $14,108 did not go to legal expenses, Young should not be able to use her own notoriety gained in the commission of her crimes to "capitalize" on her participation in the Capitol breach in this way. As Judge Faruqui did in *Lavernz*, this Court should order an accounting of the Give Send Go and legal fees and then assess the need for a fine. *See* Min. Order Aug. 5, 2024, *United States v. Rebecca Lavrenz*, 23-cr-66-ZMF; *see also* Min. Order Mar. 16, 2023, *United States v. DeGrave*, 1:21-cr-088-DLF.

## VIII.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence defendant to 10 months' incarceration followed by one year of supervised release, $500 dollars restitution, $220 special assessment, and a fine. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Young's liberty as a consequence of her behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Rebekah E. Lederer*
REBEKAH LEDERER
Assistant United States Attorney
Pennsylvania Bar No. 320922
601 D St., NW
Washington, D.C. 20001

36

(202) 252-7012
rebekah.lederer@usdoj.gov

*/s/ Pavan S. Krishnamurthy*
PAVAN S. KRISHNAMURTHY
Assistant United States Attorney
D.C. Bar No. 252831
601 D Street NW
Washington, DC 20001
(202) 252-7862
pavan.krishnamurthy@usdoj.gov